UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Christine Hoff-Pierre,                  :    Case No. 1:09-cv-884
                                        :
      Plaintiff,                        :
                                        :
vs.                                     :
                                        :
The Health Alliance of Greater          :
Cincinnati, et al,                      :
                                        :
      Defendants.                       :

**ORDER**

Before the Court is the Defendants' motion for summary
judgment.  (Doc. 40)  Plaintiff opposes the motion (Doc. 67), and
Defendants have filed a reply.  (Doc. 69)  Defendants seek
judgment on Plaintiff's claims that they discriminated and
retaliated against her in violation of the Family and Medical
Leave Act, and on the basis of her race, national origin and age,
in violation of Ohio Rev. Code 4112.02.  For the following
reasons, the Court grants in part and denies in part Defendants'
motion.

**FACTUAL BACKGROUND**

Christine Hoff-Pierre was born in Nigeria.  She moved to the
United States in 1986 and is a naturalized citizen.  She obtained
a degree in health information technology, and is certified as a
Registered Health Information Technician, which she describes as
requiring two years of training and successfully passing a

-1-

certification examination.  She began working for University Hospital in August 2000 as a Coder/Abstractor II, and earned a promotion to Coder III in 2004.  Coders generally assign code numbers to various procedures that are documented in medical records, for purposes of reimbursement and statistical reports.  Coder III employees are required to code inpatient records, a task that requires more skill than a Coder I or II position.  The Hospital developed a test at some point to determine eligibility for promotion to Coder IV, for which the employee must be able to code any type of hospital record (inpatient, outpatient, or emergency room).

Wiletta Reese supervised Hoff-Pierre from her initial hire until sometime in early 2006.  Reese was generally satisfied with Hoff-Pierre's performance.  The Hospital used a three-level rating system, in which total points earned on an evaluation between 351 to 450 equaled a rating of "exceptionally effective;" a total point score of 251 to 350 points merited an "effective" rating; and employees below 250 points were rated "less than effective."  For her November 2005 evaluation, Reese gave Hoff-Pierre a total of 290 points, rating her an "effective" employee, and praising her for her flexibility and initiative.

At some point in mid-2006, Jeanine Klein, a Caucasian, became Hoff-Pierre's new manager after Reese was demoted.  Hoff-Pierre testified that sometime that summer, Klein asked her "if

-2-

monkeys swing from trees" in Hoff-Pierre's native country, and if her city was made of mud. (Hoff-Pierre Dep. Vol. I at 56) Hoff-Pierre claims that she was offended by the remarks. Hoff-Pierre also testified that Klein singled her out and chastised her and another African-American employee for socializing with each other during work hours. Klein screamed at Hoff-Pierre on one occasion while Hoff-Pierre was talking to a doctor on the telephone, mistakenly believing that Hoff-Pierre was on a personal call. And she overheard Klein tell another Caucasian coding employee that Klein did not like "University Hospital employees," whom Hoff-Pierre asserts are predominately African-American.

Klein completed Hoff-Pierre's 2006 annual evaluation, giving her 255 total points, 35 points lower than the prior year. She received lower scores in areas covering respect, integrity, teamwork, assisting others with inquiries, and effective customer service. (Hoff-Pierre Dep. Ex. 10) Klein wrote that Hoff-Pierre needed to "be more receptive to change."

Hoff-Pierre and another African-American employee, Lovina Adeola, expressed their concerns about Klein and the deteriorating departmental environment to Rick Hinds, the Hospital's CFO. Hinds had ultimate managerial responsibility for the coding department. On August 28, 2006, Hoff-Pierre met with Hinds; according to an email that Hinds sent that day to Kathy Monroe (Klein's superior and head of the Medical Records

-3-

Department) and to Hoff-Pierre, they had discussed Hoff-Pierre's concerns about the Hospital's decision to eliminate an incentive bonus program for coders, and the department's heavy reliance on contract staff.  Hoff-Pierre suggested some alternatives for meeting the overtime needs of her department.  (Hoff-Pierre Dep. at 237-38 and Exh. 43; Hinds Dep. at 12-14 and Ex. 1)

After this discussion with Hoff-Pierre, Hinds held a staff meeting sometime in December 2006, which Hoff-Pierre believed was for the purpose of addressing her concerns about Klein.  Hinds started the meeting by discussing departmental productivity goals, and Hoff-Pierre asked if the meeting would address the issues she had brought to his attention.  Another Caucasian employee (Karen Kasselman) then told Hoff-Pierre "Well, I think you don't like Jeanine [Klein] because she is white."  When Reese tried to respond to Kasselman, Hoff-Pierre testified that Kasselman got up and approached her, putting her hands on or near her face in a threatening manner.  (Hoff-Pierre Dep. at 27-31) Reese testified that she remembered the meeting, and believed that Kasselman acted unprofessionally.  She recalled that Kasselman and Hoff-Pierre were in a heated conversation during that meeting, but she did not recall that Kasselman or Hoff-Pierre made any racial comments.  (Reese Dep. at 31-32)  Hoff-Pierre and Reese believe that Kasselman was not reprimanded or disciplined for her conduct.

-4-

Klein completed Hoff-Pierre's 2007 evaluation in December, and assigned her an overall score of 193 points, an overall rating of less than effective. (Hoff-Pierre Ex. 11) In remarking on her score for "integrity," Klein stated that Hoff-Pierre "will deny wrong doing, such as when she frequently challenged the credential status of a co-worker. She acknowledges conflict and seeks resolution. For example, she requested staff meetings to include the department director and VP, which was done. However, Christine failed to attend more than a couple of these monthly meetings. Christine does not follow proper lines of communication, skipping over the manager and department director and instead going to the VP." Klein also rated Hoff-Pierre as less than effective in assigning codes, noting that she did not meet minimum quality standards, and failed to meet quantity and quality expectations. In commenting on her abilities to provide customer service and work with co-employees, Klein stated that Hoff-Pierre had been on an extended medical leave.

On May 21, 2006, Hoff-Pierre picked up a large stack of medical records. They started to slip from her grasp, and when she attempted to grab them she felt a sharp pain from her shoulder down her arm. (Hoff-Pierre Exh. D3, accident report) Janet Stiens, a Hospital case worker for short-term disability claims, told Reese that Hoff-Pierre was placed on "modified duty"

-5-

for the period June 20 to June 26, 2006, due to restrictions of not lifting, pushing or pulling with her right arm.  Reese testified that she told Stien that Hoff-Pierre could complete all her essential job duties within those restrictions, and Hoff-Pierre returned to her job.  (Reese Dep. at 48)  In September 2006 Hoff-Pierre was told she needed surgery on her left shoulder to remove a tumor, and the Hospital approved her request for intermittent leave of absence from September 14 to September 26.  Stiens wrote to Hoff-Pierre and to Klein (who was by then Hoff-Pierre's manager) that FMLA leave was approved "for time off but not job protection." (Hoff-Pierre Dep. Ex. D16)  Hoff-Pierre returned to her normal job in early October without restrictions.

In August 2007, Hoff-Pierre needed surgery on her right shoulder, apparently as a sequel to the workplace injury she sustained in June 2006.  She was approved for workers compensation/FMLA leave from August 7 through August 31, with an estimated return date of September 1.  Her physician initially placed her on restrictions of no overhead work, no lifting greater than one pound with her right arm, and no repetitive activity.  (Abanto Dep. Ex. 5) The repetitive activity restriction was listed by early October.

Lou Abanto was her workers compensation case manager.  He testified that if an employee returning from medical leave could not perform their usual job duties, he would attempt to place the

employee in a modified job assignment.  That time would not count against an employee's 12-week FMLA leave time, but would be counted against the employee's available FMLA job protection period.  If the employee could perform their regular job despite any restrictions, FMLA leave and job protection were not impacted.  Abanto did not ascertain whether Hoff-Pierre's restrictions permitted her to return to her usual position, and he left that decision to her department manager.  Sheila Kendall, the Director of Employee Health and Assistance and head of Abanto's department, testified that her department was not involved in determining whether an employee could perform their regular job within restrictions, as that decision was made by the department managers.  (Kendall Dep. at 37)  Similarly, Mike Webster who was a Hospital HR manager, testified that the standard practice of Employee Health department was to send the employee's manager an email asking whether the manager could accommodate the employee's light duty restrictions.  If the department could not do so, then the standard practice is for Employee Health to try to find a modified light duty position. (Webster Dep. at 15)

     Kathy Monroe testified that she did not determine whether Hoff-Pierre could perform her normal job duties in August 2007. When Klein was asked who made the decision that Hoff-Pierre could not return to her job given her restrictions, she responded "If

anybody, it would have been, like, employee health because they
would have assessed if we could meet the restrictions and
determine that we were unable to meet it." (Klein Dep. at 66)
Klein described her role as "the assessment of the coding
position, whether or not she could meet the restrictions.  I
would not have encouraged it or said where she could work."
(Klein Dep. at 69)

In any event, when Hoff-Pierre returned to work with
restrictions, she was assigned to a "light duty" job in the
telecommunications department.  Over the next few months she also
worked in Air Care and in the Business Center.  She testified
that she did not ask for assignment to any of these positions,
but that "Lou [Abanto] just called me and told me that they had
found somewhere for me to go on modified duty, and that's where I
went." (Hoff-Pierre Dep. at 117)  Her "light duty" jobs were no
more physically onerous or demanding on her than her usual coding
job.  Hoff-Pierre's salary was paid by the coding department
during this time.

On October 9, Judy Henning (a Hospital case facilitator in
the Employee Health group) emailed Kathy Monroe, with copies to
Klein and Jeanette Gosselin,[1] stating that Hoff-Pierre's
physician extended her current restrictions through December 1.

---

[1] Gosselin was hired as a coding manager sometime in mid-
2007.  She was terminated after her three-month probationary
period ended.  (Klein Dep. at 63)

Henning stated: "From 9/19/07 through 10/28/07, Christine is under FMLA for job protection. However, with this extension, Christine will exhaust all FMLA from 10/29/07 through 12/1/07, no job protection. After consulting with HR Dept. you can post her position." (Hoff-Pierre Exh. D18) Henning sent a letter to Hoff-Pierre the same day giving her the same information; the letter states that "time spent in this modified duty is recognized under the FMLA for job protection, not for your eligible 12 weeks off of work. However, with this extension, you will exhaust all FMLA from 10/29/07 through 12/1/07, no job protection." (Id.) On or about November 8, Klein filled Hoff-Pierre's job by hiring Lisa Maxberry, an internal candidate who was then a Coder II. (Klein Dep. at 89-90)

Laura Fickinger works in the Hospital's HR department. On November 15, Fickinger emailed Webster and told him that Hoff-Pierre's coding position had been posted and filled, but that Klein and Monroe were concerned that Hoff-Pierre might try to return to the department on December 3 even though her job was no longer available to her. Fickinger stated that "the only open positions are Coder IV's, which she can test for to see if she is qualified. What is the best way to handle the situation?" (Klein Exh. 12) Webster then wrote to Hoff-Pierre the next day and told her that her department intended to post her position and replace her. Webster stated that Hoff-Pierre's "medical

-9-

leave of absence FMLA protection ended October 29, 2007.  Your
department needs to staff this position in order to meet business
needs.  At such point that you are able to return to work, please
contact Human Resources...".  (Hoff-Pierre Ex. D20)

Klein testified that it was Kathy Monroe who made the
decision to fill Hoff-Pierre's position.  (Klein Dep. at 71) But
Monroe testified that, while she knew the procedures to follow in
order to do that, she did not recall deciding to post and fill
Hoff-Pierre's position.  (Monroe Dep. at 58-59)  Klein could not
recall talking to Monroe about leaving the position open until
Hoff-Pierre was released from any physical restrictions.  (Klein
Dep. at 92)  Fickinger testified that she was told the coding
department wanted to fill the position because Hoff-Pierre's
leave had expired, but she was not told why the decision was made
to do so.  (Fickinger Dep. at 7-15)

When Hoff-Pierre received Webster's November 16 letter, she
called him and asked if she could return to her position and
whether there were other positions available.  Webster told her
that her position had been posted and there were no others
available.  (Hoff-Pierre Dep. at 122)  Klein could not recall
talking with Hoff-Pierre about the open Coder IV positions at
this time, but she believed that Hoff-Pierre had been given that
information by someone.  (Klein Dep. at 92, 94)  Hoff-Pierre
testified that Klein told her she was unqualified for a Coder IV

position, and that when she asked about taking the test that Jeanine "could never seem to come up with - could never find the test." (Hoff-Pierre Dep. at 149)

Monroe emailed Webster on November 29, telling him that Employee Health told Monroe that the extension of Hoff-Pierre's modified light-duty employment "could go on for a year which would be through June 2008. They want me to check with them again in May 2008 as I was asking how long my Department had to pay her out of our budget. For now, she will continue to be paid from the Med Rec Dept. Budget." (Webster Exh. 3) On December 5, 2007, Henning notified Monroe that Hoff-Pierre's physician had "extended her modified duty through February 8, 2008," and noting she had exhausted her FMLA job protection on October 29, 2007. (Hoff-Pierre Ex. D19) Sometime in December her physician apparently removed all restrictions and released her for full duty effective December 31, 2007. (Abanto Exh. 13) At that time, Klein and Monroe never considered asking Hoff-Pierre to apply for a coding position.

In early January 2008, Fickinger and Webster each told Hoff-Pierre that the Hospital would give her "a reasonable amount of time to find a posi[tion]. The more she applies for that she is qualified for, the longer we'll work with her [sic]." (Webster Exh. 5) Webster testified that employees in Hoff-Pierre's position were normally given 30 days to find another internal

position, but if they show initiative the period would be
extended and the Hospital would "work with them."  (Webster Dep.
at 61)  Fickinger also told Hoff-Pierre that she would be given
some time to find another position.  Hoff-Pierre asked Fickinger
about her yearly evaluation, and Fickinger set up a meeting for
that purpose on January 7.  After meeting with Webster, Hoff-
Pierre met with Klein to discuss her evaluation.  Hoff-Pierre
took an internal Hospital assessment test sometime in late
January or early February, and applied for a position in another
department.  She was not chosen due to a lack of necessary
managerial experience.

     In early February, Hoff-Pierre applied for a coding position
at Jewish Hospital, and felt she did well on its assessment test.
Yolanda Watts, with Jewish Hospital HR, emailed Angela Price
(also with Jewish), confirming that Hoff-Pierre was really
interested in the position and asking if Price would meet with
her.  Hoff-Pierre asked Fickinger on February 17 if she had heard
anything about the jobs she had applied for, and telling
Fickinger that she would be meeting with Angela Price that week.
(Hoff-Pierre Exh. D22)  Hoff-Pierre thought her interview at
Jewish went very well.

     On February 28, Watts told Fickinger and Webster by email
that there was another applicant for the Jewish Hospital position
whom the manager wanted to interview before making a final

-12-

decision.  Watts said she would keep Fickinger updated on the situation.  (Fickinger Exh. 9)

Hoff-Pierre also applied for a coder position at Christ Hospital.  Her interview went well and she did well on an assessment test.  She was told she would be scheduled for a second interview, and that Christ needed a reference for her. Hoff-Pierre called Fickinger to tell her that Christ would be checking her references with her manager, and then would let her know about the job.  (Hoff-Pierre Dep. at 132)  Mike Webster wrote a note on March 3 stating that Fickinger told him that day that Hoff-Pierre had accepted a position at Christ.  (Fickinger Exh. 9)  On March 4, Fickinger notified Watts and Webster in writing that Hoff-Pierre had accepted an offer from Christ, and Fickinger was waiting for a transfer date.  (Fickinger Exh. 10) Watts responded that she was glad Hoff-Pierre had been able to find a job.

But when Fickinger contacted Christ on March 14 about Hoff-Pierre's transfer date, she was told that Hoff-Pierre had not been offered a position, and Christ was sending her a rejection letter.  (Fickinger Exh. 11)  When Webster was informed of this development, he told Fickinger that he would tell Hoff-Pierre that her employment would be terminated because she had not found a job.  (Fickinger Exh. 12)  Fickinger testified that it was her understanding that Hoff-Pierre did not get the coding position at

-13-

Jewish Hospital because she had accepted the position at Christ. (Fickinger Dep. at 33) Fickinger did not contact Watts or Jewish Hospital after March 14, to ask if the position for which Hoff-Pierre had applied was still open.

Hoff-Pierre denies that she told Fickinger she had accepted an offer from Christ. She told Fickinger that "if Christ would offer me the job, I would accept it." (Hoff-Pierre Dep. at 134) Hoff-Pierre recalled talking to Fickinger about a transfer, but said she was asking if Fickinger would be able to transfer her employment information if she got the job.[2]  When Hoff-Pierre learned that she had been rejected by Christ, Fickinger told her she needed to keep looking for another internal position because her rehire eligibility would expire soon. Finally, on March 21, 2008, Webster wrote Hoff-Pierre that her employment had been terminated for failure to qualify for an alternate internal position. (Hoff-Pierre Exh. D24)

Sometime after this, Hoff-Pierre applied for a coding position through a temporary placement agency, On Assignment. The service manager told her she had been unable to reach Jeanine Klein to check her references. She later learned that the service manager had been told that Hoff-Pierre was a "troublemaker, you like to stir up stuff, and I learned that ...

_____

[2] Christ Hospital was in the process of withdrawing from membership in the Health Alliance during this time.

your attendance is very poor...".  She refused to tell Hoff-
Pierre who had given her this information.  (Hoff-Pierre Dep. at
171)

     The "MedVerify" system is a centralized, online compilation
of employee information that is used by hospitals and
organizations throughout the country to verify an employee's
prior work history and references.  A "MedVerify" form completed
for Hoff-Pierre states the dates that she worked for the
Hospital, and that the reason for her termination was "Decided
Not to Return from LOA [leave of absence]."  An item asking if
she is "Eligible for Rehire" states "deferred."  The form also
indicates that she did not meet expectations for quality and
quantity of work.  (Payne Exh. 7)

     Hoff-Pierre filed her complaint against University Hospital
and the Health Alliance on December 2, 2009.  Her FMLA
retaliation claim alleges that she was terminated because she
exercised her FMLA rights.  She also asserts four state law
claims pursuant to Ohio Rev. Code 4112.02, alleging race, age and
national origin discrimination, and unlawful retaliation.
Defendants (collectively referred to below as the "Hospital")
seek judgment on all of her claims, arguing that she has failed
to establish a prima facie case under any theory.  Hoff-Pierre
does not oppose the motion with respect to her age discrimination
claim, but contends that material issues of fact exist with

respect to the rest.

**DISCUSSION**

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  An assertion of a undisputed fact must be supported by
citations to particular parts of the record, including
depositions, affidavits, admissions, and interrogatory answers.
The party opposing a properly supported summary judgment motion
"'may not rest upon the mere allegations or denials of his
pleading, but ... must set forth specific facts showing that
there is a genuine issue for trial.'"  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in
an effort to establish a lack of material facts.  Guarino v.
Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).
Rather, the burden is on the non-moving party to "present
affirmative evidence to defeat a properly supported motion for
summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d
1472, 1479-80 (6th Cir. 1989), and to designate specific facts in
dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must
do more than simply show that there is some metaphysical doubt as
to the material facts."  Matsushita Electric Industries Co. v.

-16-

Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

FMLA Retaliation Claim

Hoff-Pierre alleges that she exercised her right to take FMLA leave, and that the Hospital terminated her as a result.  Covered employers are prohibited from retaliating against covered employees who take FMLA leave, and from using the exercise of FMLA leave rights as a negative factor in any employment actions concerning those employees.  Hunter v. Valley View Local Schools, 579 F.3d 688, 690-691 (6th Cir. 2009).

An FMLA retaliation claim is analyzed under the McDonnell-

-17-

Douglas burden-shifting framework.  A prima facie case requires Hoff-Pierre to establish (1) she was entitled to exercise her FMLA rights and did so; (2) the Hospital took an adverse employment action against her; and (3) a causal connection exists between the exercise of her rights and her termination.  If she does so, the burden then shifts to the Hospital to demonstrate that its action was based on a legitimate, non-discriminatory reason or policy.  Hoff-Pierre must then come forward with evidence demonstrating that the reason was pretextual.  See generally, Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001).

The Hospital argues that she cannot establish a prima facie case of retaliation because when she returned to work after her 2007 surgery, she was unable to perform her essential job duties for a period in excess of 12 weeks.  At that point, Hoff-Pierre was not protected from termination because she remained unable to perform her essential job duties.  Her return to the alternate, light-duty positions that Abanto found for her counted against her 12-week protection period, but were not counted for purposes of computing her available FMLA leave (of 12 weeks in a 12-month calendar period).  Once an employee is beyond the 12-week job protection period, the FMLA does not forbid an employer from terminating the employee if their old position has been filled or is unavailable.

Hoff-Pierre argues that the Hospital improperly counted her light duty work against her 12-week job protection period.  She relies on 2009 amendments to the FMLA regulations, which she contends clarified and affirmed pre-existing law.  The applicable pre-2009 regulation, 29 C.F.R. 825.220(d), stated:

> Employees cannot waive, nor may employers induce employees to waive, their rights under FMLA.  For example, employees (or their collective bargaining representatives) cannot "trade off" the right to take FMLA leave against some other benefit offered by the employer. This does not prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a "light duty" assignment while recovering from a serious health condition ... .  In such a circumstance, the employee's right to restoration to the same or an equivalent position is available until 12 weeks have passed within the 12-month period, including all FMLA leave taken and the period of "light duty".

In publishing the final regulation in 1995, the DOL addressed comments it had received about the potential interplay between worker's compensation statutes and FMLA.  Many of those comments noted that some state statutes required an injured employee to accept medically-approved light duty assignments.  In such cases, the DOL stated: "As discussed in Section 825.220(d), if the employee freely accepts the 'light duty' assignment offer in lieu of FMLA leave or returns to work before exhausting his or her FMLA leave entitlement, the employee would retain his or her right to the original or an equivalent position until 12 weeks

-19-

have passed, including all FMLA leave taken that year.  **At the conclusion of the 12-week period, if the employee is not able to perform the essential functions of the original position, the employee's right to restoration ceases.**"  60 FR 2180, 2196-2197 (January 6, 1995) (emphasis added).

The regulation was amended effective January 16, 2009, and now reads:

> (d) Employees cannot waive, nor may employers induce employees to waive, their prospective rights under FMLA. For example, employees (or their collective bargaining representatives) cannot "trade off" the right to take FMLA leave against some other benefit offered by the employer.  This does not prevent the settlement or release of FMLA claims by employees based on past employer conduct without the approval of the Department of Labor or a court.  Nor does it prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a "light duty" assignment while recovering from a serious health condition ... . An employee's acceptance of such "light duty" assignment does not constitute a waiver of the employee's prospective rights, including the right to be restored to the same position the employee held at the time the employee's FMLA leave commenced or to an equivalent position. **The employee's right to restoration, however, ceases at the end of the applicable 12-month FMLA leave year.**

29 C.F.R. 825.220(d) (emphasis added).

The DOL's final published comments for this amendment make clear that two distinct issues were addressed.  The first issue, which had resulted in conflicting judicial opinions, was whether employees were permitted to settle FMLA claims without judicial or DOL approval.  See, e.g., <u>Butler v. Merrill Lynch Business</u>

<u>Financial Serv.</u>, 570 F.Supp.2d 1047 (N.D. Ill. 2008), rejecting contrary Fourth Circuit case and finding that employee's release in connection with a severance offer included a release of retrospective FMLA claims.  DOL announced that the amended regulation was intended to reaffirm its existing position that only prospective FMLA rights were covered by the regulation, and that employees and employers were free to settle and release retrospective FMLA claims.  See 73 FR 67934, 67988 (November 17, 2008).

The second issue addressed by the amended regulation was the effect of light-duty job acceptance on an employee's 12 weeks of FMLA medical leave and job protection.  DOL's published comments cited two cases in which district courts interpreted the prior regulation to permit time spent on light duty assignments to be counted toward the employee's 12 weeks of medical leave. <u>Roberts v. Owens-Illinois, Inc.</u>, 2004 WL 1087355 (S.D. Ind. 2004); <u>Aartis v. Palos Community Hospital</u>, 2004 WL 2125414 (N.D. Ill. 2004).  DOL believed these holdings "differ from the Department's interpretation of the current regulation," citing Wage and Hour Opinion Letter FMLA-55 (March 10, 1995), which concluded that light duty assignment time cannot count against FMLA-protected medical leave.  However, many commentators responded that DOL's proposed amended regulation would also create uncertainty as to the intended impact on an employee's

right to job restoration.  The DOL stated that the 2009 amendment
was intended:

> ... to protect an employee's right to restoration to
> the position the employee held when the FMLA leave
> commenced or to an equivalent position while in a light
> duty assignment. ... Therefore, when an employee
> voluntarily accepts a light duty assignment, the
> employee does not waive his or her restoration right
> while working in the light duty assignment.  Likewise,
> the time the employee works in the light duty
> assignment does not count as FMLA leave.  Thus, the
> employee's right to restoration is essentially held in
> abeyance during the period of time an employee performs
> a light duty assignment pursuant to a voluntary
> agreement between the employee and the employer.

73 FR 67934, at 67989.  DOL explicitly recognized that **"this new
provision"** in the new final rule could create disincentives to
employers who offer light duty positions, because **"it provides a
more open-ended right to reinstatement than the current
regulation allows** ...".  Id. (emphasis added)

Thus, the Court finds the amendments with respect to light
duty positions worked a substantive change from the prior
regulation, unlike the clarification regarding settlement of
retrospective FMLA claims.  The Court agrees with Defendants that
the law at the time that Hoff-Pierre was placed on FMLA leave in
September 2007 permitted Defendant to count her period of
voluntary, non-coerced light-duty alternate job placement toward
her 12-week job protection allowance.

But Hoff-Pierre contends there is a material factual dispute
about whether she was capable of performing her essential coding

job duties when she returned to work with restrictions in September 2007.  The modified duty jobs she was assigned to do were no more physically demanding than her regular position. Kendall admitted that the Coder III written job description does not contain requirements for lifting or carrying weight.  Both Klein and Monroe admitted that a clerical staff person was available to bring large or heavy charts to the coders' work stations.  Klein also admitted that a one-pound lifting restriction with the right hand would not prevent Hoff-Pierre from performing her job, because "something could have been done." (Klein Dep. at 68)  Hoff-Pierre said that she had been able to deal with large, heavy charts in the past by lifting a portion of them at a time.  Klein thought the limitation on right-hand repetitive activity might have caused some difficulty using a computer mouse, but Klein admitted that Hoff-Pierre could have taken breaks, and that using the mouse with her left hand is something that only Hoff-Pierre could have determined was feasible.  (Id. at 69)  Moreover, Hoff-Pierre's doctor removed that restriction in early October, before her 12-week job protection period expired.

No one from the Hospital has clearly identified who actually decided that Hoff-Pierre could not perform her normal job duties, and on what basis that decision was made.  Taking the evidence in the light most favorable to Hoff-Pierre, as the Court must do at

this juncture, there is a genuine factual dispute whether the decision to assign her to light-duty was made because of her exercise of FMLA rights, and in order to hasten the expiration of her job protection period.

The Hospital also argues that the ultimate reason Hoff-Pierre was terminated is unrelated to her FMLA leave, and was based on the fact that she failed to find another position after her release from restrictions in January 2008. She applied for a position for which she was not qualified, and then for only two coding positions. The Hospital argues this is insufficient to suggest that she was really interested in maintaining her employment. The Court does not view Hoff-Pierre's claim as narrowly limited to the fact of her ultimate termination in March 2008. There is no dispute that the Hospital posted her coding job and hired her replacement as soon as her 12 weeks of FMLA job protection expired. The factual dispute is whether that decision disregarded her actual ability to perform her essential job duties, and whether it was motivated by Hoff-Pierre's exercise of her FMLA rights.

The parties also dispute whether Hoff-Pierre's complaint can fairly encompass an FMLA interference claim, as well as a retaliation claim. Hoff-Pierre argues that her complaint should be read broadly, citing Wysong v. Dow Chemical Co., 503 F.3d 441 (6th Cir. 2007), where the Sixth Circuit reversed the district

-24-

court's refusal to consider plaintiff's evidence under an interference theory.  But there, the plaintiff titled her claim as "Violations of Family and Medical Leave Act ("FMLA") 29 U.S.C. 2601 et seq" and broadly alleged that her employer had violated several provisions of the Act.  Here, in contrast, Hoff-Pierre's claim is expressly entitled "FMLA Retaliation."  She specifically alleges that the Hospital retaliated against her by terminating her as a result of her exercise of FMLA rights.  Even recognizing Rule 8's general notice-pleading standards, Hoff-Pierre expressly elected to plead a claim of FMLA retaliation.  It would be unfair to permit her to raise an interference claim only after discovery is complete and in response to the Hospital's summary judgment motion.

The employer's motive in terminating the employee is an integral part of the analysis of a retaliation claim.  Hoff-Pierre must ultimately prove that the Hospital took the adverse action because of her exercise of FMLA rights, and not because of some legitimate, non-discriminatory reason.  Edgar v. JAC Products, Inc., 443 F.3d 501, 509 (6th Cir. 2006).  The record establishes that Hoff-Pierre took a series of FMLA medical leaves in the years preceding 2007, including her leave in 2006.  She was on leave for her shoulder surgery for almost all of August 2007, and Klein specifically noted in her December 2007 evaluation that she had missed a lot of work because of medical

leave.  Taking the facts in the light most favorable to Hoff-
Pierre, she has established a genuine factual dispute as to
whether her termination from her coding position was in
retaliation for her exercise of FMLA rights.  The Hospital's
motion with respect to this claim must therefore be denied.

State Law Claims

Hoff-Pierre asserts claims for race and national origin
discrimination, and retaliation which she bases upon her
complaints of racial discrimination.  The state law claims under
Ohio Rev. Code 4112.02 are generally analyzed under federal law
principles applicable to Title VII claims.  See, e.g., Plumbers &
Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights
Commission, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (Ohio 1981).

A prima facie case of racial or national origin
discrimination based on circumstantial evidence requires Hoff-
Pierre to show that (1) she is a member of a protected class, (2)
she suffered an adverse employment action; (3) she was qualified
for her job; and (4) she was replaced by someone outside her
protected class, or was treated differently than similarly-
situated, non-protected employees.  McDonnell-Douglas v. Green,
411 U.S. 792, 802-804 (1973).  Her Ohio retaliation claim shares
elements of her FMLA retaliation claim: she must show she engaged
in protected activity; her employer knew of that activity; she
suffered an adverse employment action; and there was a causal

-26-

connection between her complaints of racial discrimination and her termination.  <u>Wrenn v. Gould</u>, 808 F.2d 493, 500 (6th Cir. 1987).

Hoff-Pierre cannot satisfy her prima facie burden on her claims of discrimination.  She was replaced in the coding department by Lisa Maxberry, an African-American woman who is two years older than Hoff-Pierre.  The only evidence bearing on either of these claims is Hoff-Pierre's own testimony that at some point, she told Monroe and Hinds that she thought Klein was racist, and that Klein made a comment to her at some point about her African homeland.  Hoff-Pierre also admitted that she believed Klein was trying to be funny in her comments about Nigeria, and did not mean to disparage Hoff-Pierre or her homeland.  Monroe, Hinds and Klein all denied that anyone, including Hoff-Pierre, had ever complained about racial or national origin discrimination.

Hoff-Pierre's written memo to Hinds, which led to the meeting at which Hoff-Pierre clashed with a fellow employee, does not contain any complaints or comments about racial or national origin discrimination.  And her allegation that she overheard Klein say she did not like "University Hospital employees" is simply too ambiguous to be considered evidence of racial bias or animus.  See, e.g., <u>Green v. Alcan Aluminum Corp.</u>, 1999 U.S. App. LEXIS 30158 (6th Cir., November 16, 1999), finding that a

supervisor's complaint about certain employees' inability to "show up at the right time everyday," or employees who cannot "take orders from the boss," were not specifically directed at African-American employees.

For similar reasons, Hoff-Pierre's retaliation claim based on her complaints of racial discrimination also fails.  The only time that Hoff-Pierre alleges she complained to Hinds and Monroe was almost a year before her termination.  The lapse of time between her alleged complaint and the adverse action is too long to permit a reasonable inference to arise that there was some causal connection between the two events.  See, e.g., Hamilton v. Gen. Elec., 556 F.3d 428, 436 (6th Cir. 2009), finding that summary judgment was improper where the plaintiff was subjected to extremely heightened scrutiny less than a month after he filed an age-discrimination claim with the EEOC, and he was fired two months thereafter.  Here, Hoff-Pierre's vague complaints about Klein were allegedly made a full year before she was terminated from her coding position, and there is nothing in the record to substantiate any other incidents of Hoff-Pierre's complaints of discrimination in the interim.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  The motion is denied with respect to Plaintiff's FMLA retaliation

-28-

claim.  In all other respects, Defendants' motion is granted.

SO ORDERED.

DATED: November 9, 2011        s/Sandra S. Beckwith
                               Sandra S. Beckwith
                               Senior United States District Judge